Woodrow STERLING, et al.,
Plaintiffs–Appellees,

v.

VELSICOL CHEMICAL CORPORA-
TION, Defendant–Appellant.

No. 86–6087.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1987.

Decided Aug. 29, 1988.

Rehearings and Rehearings En Banc
Denied Oct. 20, 1988.

---

Sidney W. Spragins, Spragins and Murchison, Jackson, Tenn., James W. Gentry, Jr., Chattanooga, Tenn., Allen Kezsbom (argued), Linda R. Blumkin, Alan V. Goldman, Deborah P. Henkin, Fried, Frank, Harris, Shriner & Jacobson, New York City, for defendant-appellant.

James S. Wilder, III, Somerville, Tenn., Sidney Gilreath, Knoxville, Tenn., Anson M. Keller (argued), Bethesda, Md., for plaintiffs-appellees.

Before LIVELY, JONES, and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge, on rehearing.

A number of persons, including these plaintiffs, who either lived or owned property near defendant's landfill, brought a class action for personal injuries and property damage resulting from hazardous chemicals leaking from the landfill and contaminating the local water supply. The district court held the corporation liable upon legal theories of strict liability, common law negligence, trespass, and nuisance. The court awarded five representative members of the class compensatory damages for their personal injuries, as well as property damages, plus prejudgment interest on the entire award. The district court further held the corporation liable to the class as a whole for punitive damages.

Upon a review of the lengthy record in this difficult case, we find that the district court properly held Velsicol liable to the five representative plaintiffs but erred in the nature and amount of the damage awards. Accordingly, we affirm in part, reverse in part, and remand with directions for recalculation of some of the damages.

## I.

### FACTS

In August, 1964, the defendant, Velsicol Chemical Corporation (Velsicol), acquired 242 acres of rural land in Hardeman County, Tennessee. The defendant used the site as a landfill for by-products from the production of chlorinated hydrocarbon pesticides at its Memphis, Tennessee, chemical manufacturing facility. Before Velsicol purchased the landfill site and commenced depositing any chemicals into the ground, it neither conducted hydrogeological studies to assess the soil composition underneath the site, the water flow direction, and the location of the local water aquifer, nor drilled a monitoring well to detect and record any ongoing contamination. From October, 1964, to June, 1973, the defendant deposited a total of 300,000 55-gallon steel drums containing ultrahazardous liquid chemical waste and hundreds of fiber board cartons containing ultrahazardous dry chemical waste in the landfill.[1]

Shortly after Velsicol began its disposal operations at the landfill site, local residents and county, state, and federal authorities became concerned about the environmental impact of the defendant's activities. As a result of this concern, the United States Geological Survey (USGS), in 1967,

---

1. The district court concluded that spent hydrocarbons buried at the landfill disposal site included not only chlorobenzene, hexachlorobutadiene, hexachloroethane, hexachloronerbornadiene, napthalene, tetrachloroethylene, toluene, hexachlorocyclopentadiene, and benzene, but also the known carcinogens carbon tetrachloride and chloroform. The drums and cartons containing these chemicals were deposited in trenches that were 15 feet deep and 12 to 15 feet wide and covered with approximately 3 feet of soil. Velsicol took no precautions to insure the drums from bursting and, invariably, some of the drums would leak their contents into the soil. Furthermore, the trenches were neither lined nor covered with any impermeable material to prevent the chemical waste from leaking into the soil. Velsicol eventually placed a clay cap over the landfill site in 1980 only after state authorities threatened a lawsuit over the imminent danger the landfill posed to the environment. 647 F.Supp. 303, 360-61, 366-71, 430-35.

prepared the first of several reports on the potential contamination effects of the chemicals deposited into the landfill up to that time. The 1967 report indicated that chlorinated hydrocarbons had migrated down into the subsoil and had contaminated portions of the surface and subsurface environment adjacent to the disposal site. While the chemicals had not reached the local water aquifer, the USGS concluded that both the local and contiguous ground water were in danger of contamination.[2] Subsequent to publication of the 1967 USGS report, Velsicol expanded the size of the landfill disposal site from twenty to forty acres.

State authorities increasingly became concerned about the defendant's disposal of ultrahazardous chemicals at the site.[3] In 1972, the state filed an administrative action to close the landfill because the chlorinated hydrocarbons buried at the site allegedly were contaminating irreparably the subsurface waters. The state ordered Velsicol to cease disposal of all toxic chemicals by August 21, 1972, and all other chemicals by June 1, 1973.

In 1976, three years after the state permanently closed the landfill disposal site, the USGS, in conjunction with state authorities, commenced updating the 1967 USGS report. One major concern, which gave rise to the new USGS study, was the possibility of the chemicals migrating toward wells utilized by local residents. In 1978, the USGS issued a written report detailing the 1976 update of the 1967 report. The 1978 report found that the water table of the local aquifer was highly contaminated. The 1978 USGS report also indicated that the local aquifer moved toward the north-west, north, and northeast, rather than just toward the east as earlier indicated in the 1967 USGS report. Consequently, residents' wells, which were previously presumed safe from contamination, were now potentially polluted. In view of the continued complaints by numerous local residents, the Department of Health conducted further well water sampling tests in 1978. These tests revealed the presence of certain chlorinated hydrocarbons in numerous wells. Additionally, in 1978, the state, the USGS, the EPA, and Velsicol all commenced numerous extensive ground water surveys of the site and surrounding area. The surveys collectively identified twelve to fifteen drinking water wells, which were adjacent to the site, as contaminated with high levels of chlorinated hydrocarbons. Specifically, the surveys established that six of these wells were contaminated by carbon tetrachloride in excess of 100 parts per billion and high amounts of chloroform. The users of these wells, and all wells within 1,000 acres around the landfill site, were advised to stop using them for any purpose.[4]

In 1978, forty-two plaintiffs sued Velsicol in the Circuit Court of Hardeman County, Tennessee, on behalf of themselves and all others similarly situated for damages and injunctive relief. The complaint sought $1.5 billion in compensatory damages and $1 billion in punitive damages. The defendant removed the action to the United States District Court for the Western District of Tennessee, alleging diversity of citizenship and the requisite amount in controversy. Shortly after removal, all but fifteen of the original forty-two plaintiffs settled their claims. Plaintiffs' counsel filed an amended complaint for damages and injunctive

---

2. However, the 1967 USGS report erroneously concluded that, even once the chemicals reached the local aquifer, there was no danger of contamination to any existing domestic wells because the local aquifer moved to the east while the limited residential development in the area was located west. In actuality, the water aquifer flowed in a northwesterly direction.

3. Although Velsicol's increased operations at the landfill greatly concerned state officials, prior to 1972, they had no authority to stop Velsicol's activities. However, commencing on July 1, 1972, the Tennessee Solid Waste Management

Act, Tenn.Code Ann. §§ 68–31–101 to 117, vested state officials with the authority to limit, and in some circumstances indefinitely suspend, the disposal of chemical waste at existing sites.

4. Although numerous wells were ultimately contaminated and many of these wells were closed by the state authorities, only five wells, for the purpose of the trial, were of major importance because it was from these wells that five representative members of the subsequently filed class action obtained their water.

relief and added forty-seven new plaintiffs to the original lawsuit pursuant to Fed.R. Civ.P. 20(a). The complaint sought relief for involuntary exposure to certain chemical substances known to cause cancer, affect the central nervous system and permanently damage other organs of the human body, and for loss of value to their real property in the region affected by the chemicals. Additionally, seven individual civil actions involving fourteen plaintiffs were instituted against Velsicol alleging that the defendant negligently disposed of toxic chemical wastes. The district court, on its own motion and over the defendant's objection, certified a Fed.R.Civ.P. 23(b)(3) class action thereby consolidating the separate lawsuits. Thereafter, the plaintiffs' counsel filed a list of class action participants. At this time, the district court directed the plaintiffs' counsel to designate five representative plaintiffs whose claims were to be tried in the first instance to establish liability and damages on their individual claims, liability to the entire class, and punitive damages, if any. The class action proceeded to trial with the five representative plaintiffs proposed by the plaintiffs' counsel (Steven Sterling, Daniel Johnson, Curry Ivy, James Wilbanks, and James Maness, Jr.).

After a bench trial of the five claims, the district court found Velsicol liable to the plaintiffs on legal theories of strict liability, common law negligence, trespass, and nuisance. The court concluded that the defendant's hazardous chemicals, which escaped from its landfill and contaminated plaintiffs' well water, were the proximate cause of the representative plaintiffs' injuries. The district court awarded the five individuals compensatory damages totalling $5,273,492.50 for their respective injuries, plus prejudgment interest dating back to July, 1965, of $8,964,973.25. All damages, except for $48,492.50 to one plaintiff for property damage claims, were awarded for personal injuries. The district court also awarded $7,500,000 in punitive damages to the class as a whole. The court deferred to individual hearings, to be held after trial, the issues of causation and injury of any other persons purporting to be

members of the class entitled to share in this award.

On appeal, the defendant argues that the district court lacked subject matter jurisdiction over the class members and impermissibly certified the case as a class action. The defendant further argues the district court erred in finding that the plaintiffs were exposed to its chemicals and that there was a causal connection between their exposure, if any, and their resultant injuries. Accordingly, the defendant asserts the district court improperly awarded compensatory damages to the plaintiffs for their alleged injuries. Defendant also asserts that prejudgment interest on the compensatory award and punitive damages should not have been awarded. We address the defendant's arguments *seriatim*.

## II.

### SUBJECT MATTER JURISDICTION

The defendant argues that the district court lacked subject matter jurisdiction over all but two of the representative class plaintiffs. Velsicol states the remaining three representative plaintiffs, and all other putative class members, never formally filed any pleadings specifically alleging and justifying that the amount of controversy between each of them and the defendant exceeded $10,000. Velsicol further asserts that, once it challenged the district court's jurisdiction over these plaintiffs, the court was obligated to consider immediately the sufficiency of each plaintiff's claim and dismiss all of those plaintiffs unable to demonstrate a valid claim at that time.

In the instant case, Velsicol filed two separate Fed.R.Civ.P. 12(b)(1) dismissal motions prior to trial. Defendant moved to dismiss all absent plaintiffs who, though they received class action notification, failed to comply with the class certification order and allege claims in excess of the requisite jurisdictional amount. The defendant also moved to dismiss those plaintiffs who subsequently joined in the class action pursuant to Fed.R.Civ.P. 20(a) but failed to assert claims in excess of $10,000 each. The plaintiffs' counsel responded

that all of the representative class plaintiffs and designated class members each asserted a claim in excess of the requisite amount. Counsel reasoned that each of the original plaintiffs claimed an amount far in excess of $10,000 in the ad damnum clause of their amended complaint. Therefore, each of the remaining plaintiffs, who became part of the class action by not opting out, adopted the ad damnum provision.

At a pretrial hearing, the district court decided that the defendant's motion as to the representative class members would be determined at trial and deferred the decision as to all other class members until a later date.[5] The trial commenced on June 21, 1982. In a September 16, 1985 consent order, which recertified the class and identified 128 individuals including the five representative plaintiffs as members of the class, the court stated that:

> recertification and reduction of the number in a class merely constitutes a *prima facie* finding by this Court that those persons named ... can in good faith state a claim in excess of $10,000.

Subsequently, the court held in its August 1, 1986 opinion that the proper pleadings, jurisdictional amount, and notice requirements of the representative class members had been properly complied with in all respects and were indicative of the remaining party plaintiffs' claims. Each of the representative plaintiffs were awarded compensatory damages far in excess of $10,000.

■■■ Defendant properly argues that, in accordance with *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), and *Amen v. City of Dearborn*, 532 F.2d 554 (6th Cir.1976), *appealed on other grounds*, 718 F.2d 789 (6th Cir.1983), *cert. denied*, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), each plaintiff in a class action individually must

allege a claim in excess of $10,000. Likewise, a judgment may be vacated at any time, even on appeal, for lack of subject matter jurisdiction. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984); *Basso v. Utah Power & Light Co.*, 495 F.2d 906 (10th Cir.1974); *Canadian Indemnity Co. v. Republic Indemnity Co.*, 222 F.2d 601 (9th Cir.1955). However, defendant erroneously asserts that once it challenges the district court's jurisdiction with respect to the amount in controversy for each class member, the court must make an immediate determination of the sufficiency of each claim. Fed.R.Civ.P. 12(d) provides that:

> The defenses specifically enumerated (1)–(7) in subdivision (b) of this rule, whether made in a pleading or by motions ... shall be heard and determined before trial on application of any party *unless the court orders that the hearing and determination thereof be deferred until the trial.*

(Emphasis added). The method and timetable for deciding a Rule 12(b) motion under Rule 12(d) is left to the sole discretion of the trial judge who may defer that determination until trial. In response to defendant's Rule 12(b) motions, the plaintiffs' counsel repeatedly asserted that each class member alleged a claim in excess of the requisite jurisdictional amount. In determining whether a dismissal is justified for lack of the jurisdictional amounts, the sums posited by the plaintiffs, provided they are made in good faith, control unless it appears to a legal certainty that their claims are, in actuality, for less. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Velsicol failed either to assert that the plaintiffs proffered bad faith damage claims or

---

**5.** At the pretrial hearing, the district court stated in pertinent part:

[I]t also seems to me that it is not necessary at this point for the court to wholesale order a dismissal of all those potential class members who may not at this point have pleaded, because it seems to me that that's a matter that might well come up at some point down the road after the initial phase of the case is

tried.... [W]hen you get down to establishing amounts in a case such as this, where there is a jury trial, it puts a burden on the court that the court really doesn't want to undertake, and that is an assessment of claims at this point to try and make a determination of whether a jurisdictional amount, in fact, can be asserted at this point....

to set forth any basis for justifying its allegation that the plaintiffs' claims were for less than the jurisdictional amount. Rather, Velsicol charges the district court with "policing" the sufficiency of each plaintiff's claim. Absent some apparent reason for delving into the substance of the plaintiffs' posited claims, the district court is not saddled with such an affirmative obligation. The district court stated, in both its consent order and subsequent opinion, that each of the representative and remaining putative class members posited good faith claims in excess of $10,000. Consequently, while it might have been preferable to have addressed the defendant's dismissal motions far earlier in the course of the proceeding, we cannot say that the district court improperly exercised its jurisdiction over the representative and remaining class members.[6]

### III.

### CLASS ACTION CERTIFICATION

Velsicol argues that the district court improperly certified this case as a Fed.R. Civ.P. 23(b)(3) class action because common questions of law or fact did not predominate over individual questions. As to the requirements necessary for certification of a Rule 23(b)(3) class action, the district court held in its February 12, 1981 certification order that (1) the class was so large that joinder of all members was impractical (Rule 23(a)(1)), (2) there were questions of law or fact common to the class (Rule 23(a)(2)), (3) representative claims were typical of the claims of the class (Rule 23(a)(3)), and (4) the representative parties would fairly and adequately protect the interests of the class (Rule 23(a)(4)). The court further found that questions of law or fact common to the members of the class predominated over any questions affecting only individual members and that a class action would be superior to other available methods for the fair and efficient adjudication of the controversy (Rule 23(b)(3)).[7]

The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense. *See, e.g., Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla.1973), *aff'd without opinion*, 507 F.2d 1278 (5th Cir.1975); *Buford v. American Finance Co.*, 333 F.Supp. 1243 (N.D.Ga. 1971). See *also* Fed.R.Civ.P. 1. However, the problem of individualization of issues often is cited as a justification for denying class action treatment in mass tort accidents.[8] While some courts have adopted

---

6. Haunted by the specter of protracted trials and in an effort to better serve judicial economy, courts are increasingly experimenting with utilizing representative plaintiffs for determining a defendant's liability to the class as a whole in mass, complex, toxic tort cases. All of this experimentation occurs amid questions about the effectiveness of the representative plaintiffs' approach in accomplishing the goal of setting benchmarks for settlement. However, as this debate continues, courts increasingly are required to establish a criterion for selecting such representatives. There are essentially four basic approaches to selecting representative plaintiffs: plaintiffs' counsel selects all representatives; each side selects an equal number of representatives; plaintiffs' counsel or both sides nominate plaintiffs and the judge selects the representatives; or representatives are randomly selected from established categories of plaintiffs. However, because Velsicol does not raise the manner in which the five individuals were selected to serve as representative plaintiffs to determine its liability to the class as a whole, we do not consider this issue on appeal.

7. In its September 29, 1986 order, the court stated in pertinent part:

> Early on in this case, because of the sheer magnitude of this litigation, the claims of five representative plaintiffs, whose claims are fairly representative of the claims of the class as a whole, were selected for trial. It was decided all claims would be tried by the court in this phase of the trial and final judgment entered on all of the claims of the five representative plaintiffs.... This approach was adopted by the Court as the only reasonable way for the Trial Court to manage in an efficient way the complex factual and legal issues presented by this mind-boggling class action lawsuit.

8. The Advisory Committee Note to the 1966 Revision of Rule 23(b)(3) provided:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in

this justification in refusing to certify such accidents as class actions,[9] numerous other courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct.[10] In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

The district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based upon the particular facts of the case, should not be overturned absent a showing of abuse of discretion. *See Hopper v. Schweiker*, 596 F.Supp. 689 (M.D. Tenn.1984), *aff'd*, 780 F.2d 1021 (6th Cir. 1985), *cert. denied*, 475 U.S. 1111, 106 S.Ct. 1522, 89 L.Ed.2d 920 (1986); *Kentucky Educators Public Affairs Council v. Kentucky Registry of Election Finance*, 677 F.2d 1125 (6th Cir.1982); *Cross v. National Trust Life Insurance Co.*, 553 F.2d 1026 (6th Cir.1977). In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

In the instant case, each class member lived in the vicinity of the landfill and allegedly suffered damages as a result of ingesting or otherwise using the contaminated water. Almost identical evidence would be required to establish the level and duration of chemical contamination, the causal connection, if any, between the plaintiffs' consumption of the contaminated water and the type of injuries allegedly suffered, and the defendant's liability. The single major issue distinguishing the class members is the nature and amount of damages, if any, that each sustained. To this extent, a class action in the instant case avoided duplication of judicial effort and prevented separate actions from reaching inconsistent results with similar, if not identical, facts. The district court clearly did not abuse its discretion in certifying this action as a Rule 23(b)(3) class action. However, individual members of the class still will be required to submit evidence concerning their particularized damage claims in subsequent proceedings.

---

different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.
Adv.Comm.Note, 39 F.R.D. 69, 103 (1966).

9. *See In re N. Dist. of California Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *McDonnell Douglas Corp. v. United States Dist. Court*, 523 F.2d 1083 (9th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *In re Three Mile Island Litig.*, 87 F.R.D. 433 (M.D.Pa.1980); *Yandle v. PPG Indus.*, 65 F.R.D. 566 (E.D.Tex.1974); *Boring v. Medusa Portland Cement Co.*, 63 F.R. D. 78 (M.D.Pa.), *appeal dismissed*, 505 F.2d 729 (3d Cir.1974); *Daye v. Pennsylvania*, 344 F.Supp. 1337 (E.D.Pa.1972), *aff'd*, 483 F.2d 294 (3d Cir. 1973), *cert. denied sub nom. Meyers v. Pennsylvania*, 416 U.S. 946, 94 S.Ct. 1956, 40 L.Ed.2d 298 (1974).

10. *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir.1987); *In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir.), *cert. denied sub nom. Stover v. Rau*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); *Payton v. Abbott Labs*, 83 F.R.D. 382 (D.C.Mass.1979); *Coburn v. 4-R Corp.*, 77 F.R.D. 43 (E.D.Ky.1977), *mandamus denied*, 588 F.2d 543 (6th Cir.1978); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D.Fla.1973); *aff'd without opinion*, 507 F.2d 1279 (5th Cir.1975).

## IV.

### PROXIMATE CAUSATION

The main thrust of Velsicol's argument on appeal is that there was insufficient evidence to support a finding of causation between its disposal of toxic chemicals and plaintiffs' injuries. Velsicol further argues that the various types of injuries identified by the district court were based upon impermissibly speculative and conjectural evidence.

In accordance with Fed.R.Civ.P. 52(a), a finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Oregon State Medical Society,* 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). However, if the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed.

150 (1949). Indeed, the reviewing court oversteps the bounds of its duty under Fed.R.Civ.P. 52(a) if it undertakes to duplicate the role of the lower court. *Anderson v. City of Bessemer,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). A district court's ultimate and subsidiary findings concerning causation,[11] negligence,[12] nuisance,[13] trespass,[14] actual damages,[15] and punitive damages,[16] are all factual determinations included within the scope of Rule 52(a). This is even clearer when the trial involves technical or scientific issues.[17]

Velsicol argues that proof of the plaintiffs' exposure to its chemicals and the causal connection between that exposure, if any, and their subsequent injuries impermissibly was based upon insufficient evidence. Specifically, the defendant asserts that there was no evidence that two known carcinogens (carbon tetrachloride and chloroform) were in the plaintiffs' wells in the late 1960's and early 1970's when they allegedly were consuming the contaminated water. To overcome this lack of evidence, Velsicol contends that the plaintiffs introduced into evidence an invalid water computing model that erroneously concluded that the plaintiffs were exposed to significant levels of contaminants as early as 1970.[18] By extrapolation, the plaintiffs'

11. *See Irving Pulp & Paper v. Dunbar Transfer & Storage Co.,* 732 F.2d 511 (6th Cir.1984); *Drayton v. Jiffee Chem. Corp.,* 591 F.2d 352 (6th Cir.1978); *Downs v. United States,* 522 F.2d 990 (6th Cir.1975); *Gowdy v. United States,* 412 F.2d 525, 532–33 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969).

12. *See Grover Hill Grain Co. v. Baughman-Oster, Inc.,* 728 F.2d 784 (6th Cir.1984); *Hysell v. Iowa Pub. Serv. Co.,* 534 F.2d 775 (8th Cir.1976); *Spector v. Mermelstein,* 485 F.2d 474 (2d Cir. 1973); *Utzinger v. United States,* 432 F.2d 485 (6th Cir.1970); *Pierce v. New York Central R.R.,* 409 F.2d 1392 (6th Cir.1969); *Ferguson v. Prudential Ins. Co.,* 399 F.2d 47 (6th Cir.1968).

13. *See, e.g., Bostick v. Smoot Sand & Gravel Corp.,* 260 F.2d 534 (4th Cir.1958).

14. *See MacDonnell v. Capital Co.,* 130 F.2d 311 (9th Cir.1942); *Brandt v. Robertson,* 266 F.2d 456 (D.C.Cir.1959); *McComb v. McCormack,* 159 F.2d 219 (5th Cir.1947).

15. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Gibbs*

*v. United States,* 599 F.2d 36 (2d Cir.1979); *Smith v. Manausa,* 535 F.2d 353 (6th Cir.1976).

16. *See, e.g., United States Steel Corp. v. Fuhrman,* 407 F.2d 1143 (6th Cir.1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970).

17. *See Nyyssonen v. Bendix Corp.,* 342 F.2d 531 (1st Cir.), *cert. denied,* 382 U.S. 847, 86 S.Ct. 63, 15 L.Ed.2d 86 *reh'g denied,* 382 U.S. 934 (1965); *Radio Corp. of America v. Philco Corp.,* 275 F.Supp. 172 (D.N.J.1967).

18. In actuality, both the plaintiffs and defendant utilized the same water computer model, namely the Trescott, Pinder and Larson model, to trace the level of chemical contamination. The dramatic differences between the plaintiffs' and the defendant's water models were due to different assumptions concerning the contaminant loading rates and porosity. If one chooses a high rate of porosity, the model will make it appear that the chemicals arrive and leave quickly with a very high level for a short period of time. If a low rate of porosity is used, there

model purported to show that dramatically high concentrations of carbon tetrachloride and chloroform were in the plaintiffs' wells as early as 1970 and, therefore, that the plaintiffs had been exposed to the chemical contaminants in sufficiently high dosages for a prolonged period of time sufficient to cause their resultant injuries.

■ On appeal, the defendant not only questions the validity of ground water modeling techniques in general, but also argues that plaintiffs' particular model fatally failed to utilize all of the relevant data. We reject both of Velsicol's arguments. Numerous courts have validated water modeling techniques to predict past levels of contamination in drinking water where the model was both properly conceived and constructed. *See e.g., Anderson v. W.R. Grace & Co.,* 628 F.Supp. 1219 (D.Mass.1986). The plaintiffs carefully devised, calibrated, and tested their model, based upon physical data generated by Velsicol's own consultants, to determine the physical and chemical characteristics beneath the landfill. They properly formulated the various components of the model (the determination of transmissivity, the infiltration rate, the water table configuration, the porosity, the dispersion coefficient, and the ground water velocity) and utilized all relevant data. The plaintiffs' failure to incorporate selected well samplings conducted after 1978 necessarily does not invalidate their model and the conclusions to be drawn therefrom.

In 1978, the EPA tested nineteen of twenty-two domestic wells (not including four USGS wells) for chemical contamination. After 1978, only one of the five wells from which the representative plaintiffs drank or otherwise used water and seven of the nineteen remaining wells were ever again tested. Data showing the level of chemical contamination of these remaining wells was available only upon a limited and sporadic basis. While the plaintiffs did not incorporate these post–1978 well samplings into their model, they thoroughly reviewed and utilized the data to confirm the water table contour component of their model. Plaintiffs also did not utilize soil column studies, such studies having been abandoned by Velsicol itself and found non-credible by the district court. However, the plaintiffs utilized all other relevant data including, but not limited to, the 1964 Rima Study, the 1978 Sprinkle Study, the data generated by the State of Tennessee in 1970, all the information generated by AWARE, and all of the monitoring information by Velsicol, the State of Tennessee, and the EPA. Because the district court carefully considered the plaintiffs' model, including its components and the data it utilized, we cannot say that it erred in using the model in concluding that Velsicol's chemicals contaminated the plaintiffs' wells as early as 1970.

■ Next, Velsicol argues there was insufficient evidence to prove causation between plaintiffs' ingestion, if any, of Velsicol's chemicals and their alleged resultant injuries. The question of proximate cause is always to be determined on the facts of each case. *See Wooten v. United States,* 574 F.Supp. 200 (W.D.Tenn.1982), *aff'd,* 722 F.2d 743 (6th Cir.1983); *Ricker v. Zinser Textilmaschinen GmbH.,* 506 F.Supp. 3 (E.D.Tenn.1978), *aff'd,* 633 F.2d 218 (6th Cir.1980); *Wyatt v. Winnebago Industries,* 566 S.W.2d 276 (Tenn.App.1977); *Mullins v. Seaboard Coastline Railway,* 517 S.W. 2d 198 (Tenn.App.1974); *Carney v. Goodman,* 38 Tenn.App. 55, 270 S.W.2d 572 (1954). On the basis of expert testimony (consisting of treating physicians, medical specialists, scientists, psychiatrists, clinical psychologists, engineers, hydrologists, and the plaintiffs themselves), numerous studies, and extensive literature, the district court concluded that Velsicol's chemicals and the duration of the plaintiffs' exposure to them were *capable* of causing the types

is a more insidious level of exposure over a longer period of time that cannot be predicted by odor or taste. The district court rejected the defendant's water model as inaccurately under-representing the extent of chemical contamination in the ground water supply. In refuting the defendant's model, the court reasoned that Velsicol had failed to factor in the massive dumping of liquid waste, the ponding of water in the trenches, and the draw down on the aquifer caused by new homes.

of injuries alleged by the plaintiffs. The court also concluded that all of the five representative plaintiffs' presently ascertainable and reasonably anticipated future injuries were proximately caused by ingesting or otherwise using the contaminated water.[19]

Thus, the court, as is appropriate in this type of mass tort class action litigation, divided its causation analysis into two parts. It was first established that Velsicol was responsible for the contamination and that the particular contaminants were *capable* of producing injuries of the types allegedly suffered by the plaintiffs. Up to this point in the proceeding, the five representative plaintiffs were acting primarily in their representative capacity to the class as a whole. This enabled the court to determine a kind of generic causation—whether the combination of the chemical contaminants and the plaintiffs' exposure to them had the capacity to cause the harm alleged. This still left the matter of *individual* proximate cause to be determined. Although such generic and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual components of each plaintiff's injuries. However, from this point forward, it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by ingestion or otherwise using the

contaminated water. We cannot emphasize this point strongly enough because generalized proofs will not suffice to prove individual damages. The main problem on review stems from a failure to differentiate between the general and the particular. This is an understandably easy trap to fall into in mass tort litigation. Although many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis.

To the extent that the plaintiffs seek damages for their bodily injuries, they must prove to a "reasonable medical certainty," though they need not use that specific terminology, that their ingestion of the contaminated water caused each of their particular injuries. *See Thompson v. Underwood,* 407 F.2d 994 (6th Cir.1969); *Maryland Casualty Co. v. Young,* 211 Tenn. 1, 362 S.W.2d 241 (1962). This standard implicates the qualifications of the witnesses testifying, the acceptance in the scientific community of their theories, and the degree of certainty as to their conclusions. This standard is of particular importance when dealing with injuries or diseases of a type that may inflict society at random, often with no known specific origin. On numerous occasions, the Tennessee Supreme Court has addressed the degree of certainty of medical testimony required to establish a causal connection between a plaintiff's injuries and a defendant's tortious conduct. *See e.g., Lindsey v. Miami Development Corp.,* 689 S.W.2d

---

**19.** Of the eleven chemicals contaminating plaintiffs' well water, the reported physiological and psychological effects of five of these chemicals was of particular importance:

*Carbon tetrachloride:* The principal acute effects of ingesting or inhaling carbon tetrachloride are liver and kidney necrosis and dysfunction, and depression of the central nervous system. Exposure also produces alterations in the activity of the liver microsomal enzyme system, development of fatty liver, liver enlargement, and changes in blood enzyme. Carbon tetrachloride is a well-documented carcinogen.

*Chloroform:* Inhalation of large doses of chloroform can result in narcosis, anesthesia, gastrointestinal upset, cardial sensitization, and damage to the kidney and liver. Chronic exposure to chloroform most typically results in liver damage.

*Chlorobenzene:* Chlorobenzene is a central nervous system depressant which causes symptoms typical of its anesthetic effect. Exposure to this chemical may cause headaches, upper respiratory tract irritation, eye irritation, numbness and eventual loss of consciousness.

*Tetrachloroethylene:* Exposure to tetrachloroethylene produces effects primarily on the nervous system, including unconsciousness, dizziness, headache, vertigo or light narcosis. Other effects occur in the liver, mucous membranes, eyes, lungs, kidney, heart and skin.

*Hexachloroethane:* Exposure to this chemical causes eye irritation, including the inability to close the eyelid, tearing, inflammation, and visual intolerance to light.

856 (Tenn.1985); *Owens Illinois, Inc. v. Lane,* 576 S.W.2d 348 (Tenn.1978); *P & L Construction Co. v. Lankford,* 559 S.W.2d 793 (Tenn.1978); *Laughlin Clinic, Inc. v. Henley,* 208 Tenn. 252, 345 S.W.2d 675 (1961); *Lynch v. LaRue,* 198 Tenn. 101, 278 S.W.2d 85 (Tenn.1955). Whereas numerous jurisdictions have rejected medical experts' conclusions based upon a "probability," a "likelihood," and an opinion that something is "more likely than not" as insufficient medical proof, the Tennessee courts have adopted a far less stringent standard of proof and have required only that the plaintiffs prove a causal connection between their injuries and the defendant's tortious conduct by a preponderance of the evidence. While, in accordance with Tennessee common law, plaintiffs' proof by a reasonable medical certainty requires them only to establish that their particular injuries more likely than not were caused by ingesting the contaminated water, their proofs may be neither speculative nor conjectural. Medical testimony that ingesting the contaminated water "possibly," "may have," "might have," or "could have" caused the plaintiffs' presently ascertainable or anticipated injuries does not constitute the same level of proof as a conclusion by a reasonable medical certainty. Although it is argued that a lesser standard of proof allocates loss on a socially acceptable basis, it is the province of the state legislatures to make such changes as they have done in some areas by establishing "no-fault" or other alternate systems.

■ While upon review of the record in its entirety we cannot say that the district court abused its discretion in making its determination of the proximate causation between Velsicol's chemical dumping operations, the resultant contamination of the plaintiffs' water supply and the capacity of the contaminated water to cause the harms alleged, we find the district court erred in attributing all of the representative plaintiffs' alleged injuries to drinking or other-

wise using the contaminated water. We, therefore, address each category of the district court's damage award.[20]

## V.

## COMPENSATORY DAMAGES

Velsicol argues that, even assuming proof of a proximate causation, the district court improperly awarded the five representative plaintiffs compensatory damages for their respective injuries and disabilities. The five representative plaintiffs, their exposure to Velsicol's chemicals, and their respective injuries are as follows:

*Steven Sterling:* Plaintiff Sterling, who was born December 25, 1922, in Hardeman County, Tennessee, utilized a well adjacent to his residence (Sterling well) for drinking purposes until November, 1977, and for all other purposes until November, 1978. During that time, he claimed to have drunk between ten and twelve glasses of the well water each day. He observed that, beginning in 1975, the well water developed a distinct odor, a bad taste, and contained an oily substance. Sterling testified that after ingesting, and otherwise using, the well water for a prolonged period of time, he suffered from headaches, nervousness, stomach and chest pains, shortness of breath, ringing in his ears, fatigue, loss of appetite and weight, nausea, coughing, vomiting, and peripheral neuropathy. Sterling further testified that he suffered from an enlarged liver with abnormal hepatic function, and an eighty percent reduction in his kidney function. Additionally, he developed emphysema in early 1976. Sterling was a heavy smoker for over forty-five years and previously worked in a cotton mill.

*James Wilbanks:* Plaintiff Wilbanks, who was born in Walton, Mississippi, on June 15, 1931, lived in a mobile home with his family across from the Velsicol landfill from 1968 through 1971. During that time period, both Wilbanks and his family used

**20.** On appeal, Velsicol does not specifically argue that the district court erred in awarding the five representative plaintiffs damages for pain and suffering. *See e.g., Dixie Feed & Seed Co. v. Byrd,* 52 Tenn.App. 619, 376 S.W.2d 745 (1963), *cert. denied,* Tenn.S.Ct., *cert. denied,* 379 U.S. 15, 85 S.Ct. 147, 13 L.Ed.2d 84 (1964). Finding that the court had a proper basis for its award, therefore, we do not address this category of damages.

water from a well adjacent to his property for drinking and bathing purposes (Tavern well). Beginning in 1971, Wilbanks commuted to work and used water at a tavern located across from the Velsicol landfill until it was closed and the well was capped in 1972. Thereafter, he used water obtained from two other wells for drinking and bathing purposes until 1978 (Sterling well and Rosetta Brooks well). Wilbanks testified that he suffered from headaches, dizziness, fatigue, nausea, vomiting, numbness, nervousness, ringing in his ears, shortness of breath, skin irritation, partial loss of eyesight including optic atrophy and neuritis, and peripheral neuropathy. Wilbanks lost his left kidney in 1981 due to cancer and suffers from emphysema.

*Curry Ivy:* Plaintiff Ivy, who was born on January 3, 1926, in Chester County, Tennessee, drank contaminated water from three wells (Rosetta Brooks well, Velsicol Farm well, and Tavern well). He moved from the area in 1972. Ivy also was exposed to the ultrahazardous liquid and dry chemicals from January, 1972, through June, 1973, while he was employed by Velsicol to transport chemicals from its plant in Memphis, Tennessee, to its landfill in Hardeman County, Tennessee. Ivy testified that he suffered from headaches, dizziness, nausea, vomiting, nervousness, shortness of breath, fatigue, partial loss of eyesight including optic nerve neuritis and nerve dysfunction, and peripheral neuropathy. Ivy further testified that he suffered from liver and kidney damage and severe emphysema. Ivy's medical history prior to drinking, or otherwise using, any contaminated well water included ulcers, stomach problems, severe emphysema, partial loss of vision, a heart attack, and various psychological problems. Ivy was a heavy smoker and previously worked in a cotton mill.

*Daniel Johnson:* Plaintiff Johnson, who was born May 18, 1938, in Algoma, Mississippi, lived in Hardeman County from 1976 through 1978. During that time, Johnson and his family used water from a well adjacent to his property (Johnson well) for drinking and bathing purposes. Johnson testified that he suffered from headaches, loss of balance, fatigue, nausea, vomiting, numbness, nervousness, skin irritation, coughing, and partial loss of eyesight including optic nerve dysfunction. Johnson further testified that he suffered liver and kidney damage. Additionally, the Missouri Department of Health certified that, as of 1980, he was totally disabled and unable to continue employment as a result of psychological injuries. Johnson's wife and daughter developed breast and uterus tumors. Mrs. Johnson previously suffered from fibrocystic disease.

*James Maness, Jr.:* Plaintiff Maness, who was born on September 1, 1976, drank and was bathed in water obtained from two wells (Sterling well and Mosier well) until approximately 1978. Additionally, while Maness' mother was pregnant, she drank water obtained from the same wells. Maness allegedly suffered from frequent headaches, dizziness, nose bleeds, sore throat, nausea, and frequent vomiting. Additionally, Maness suffered from severe allergies, epilepsy, diabetes, blood discrasias, and an abnormally enlarged liver.

Based upon these findings, the district court awarded the five representative plaintiffs compensatory damages for the following injuries:

| | Sterling | Wilbanks | Ivy | Johnson | Maness |
|---|---|---|---|---|---|
| Extent of Injury and Disability, Including Increased Risk of Cancer and Disease | $ 150,000 | $150,000 | $ 75,000 | $ 150,000 | $ 250,000 |
| Immune System Impairment | 75,000 | 75,000 | 75,000 | 150,000 | 500,000 |
| Post–Traumatic Stress Disorder | 50,000 | 25,000 | 50,000 | 250,000 | — |
| Fear of Increased Risk of Cancer and Disease | 75,000 | 100,000 | 50,000 | 250,000 | 250,000 |

|  | Sterling | Wilbanks | Ivy | Johnson | Maness |
|---|---|---|---|---|---|
| Physical Pain Emotional Suffering | $ 125,000 | $250,000 | $ 50,000 | $ 125,000 | $ 150,000 |
| Impaired Quality of Life | 150,000 | 75,000 | 50,000 | 100,000 | 500,000 |
| Real Property | 48,492.50 | — | — | — | — |
| Lost Wages Earning Capacity | — | — | — | 250,000 | 500,000 |
| Learning Disorders | — | — | — | — | 150,000 |
| TOTAL: | $673,492.50 | $675,000 | $350,000 | $1,275,000 | $2,300,000 |

## A. Extent of Injury and Disability

Velsicol asserts there was insufficient medical proof of the causal connection between ingestion of contaminated water and certain injuries. First, we focus upon that portion of the award attributed to the plaintiffs' actual physical injuries and then upon the portion of the award attributed to their increased susceptibility to cancer and other diseases.

### 1. Presently Ascertainable Injuries

As a portion of its award for the extent of their injuries and disabilities proximately caused by ingesting the contaminated water, the district court awarded the five representative plaintiffs damages for their presently ascertainable injuries. In its opinion and order granting judgment to the plaintiffs, with respect to plaintiffs Sterling, Johnson, and Maness, the district court merely referred to the "extent of [their] injury and disability" without further indicating which specific injuries were included in this category. However, the district court clarified the basis of its award by adopting and incorporating into its opinion findings of fact submitted by the plaintiffs' counsel. By adopting such findings, the court credited plaintiffs' evidence that plaintiffs Sterling, Johnson, and Maness each suffered from kidney and liver damage and numerous central nervous system injuries. In its opinion and order with respect to plaintiff Wilbanks, the court referenced the "loss of one kidney already to cancer and optic atrophy and neuritis" as some of the elements of its award and, with respect to plaintiff Ivy, the court referenced "optic atrophy and neuritis" as some of the elements of its award. The court further adopted the plaintiffs' proposed findings to the effect that plaintiffs Wilbanks and Ivy also suffered from kidney and liver damage and numerous central nervous system injuries.

In seeking damages for actual physical injuries, a plaintiff must prove to a reasonable medical certainty that his or her injuries were caused by a defendant's acts or omissions. To this extent, an award is not insulated from review merely because the trial court refrains from particularizing the basis of a general injury award. If, for example, a plaintiff fails to establish sufficient causation between a defendant's acts and a specific injury, we may, nonetheless, remand the entire award to exclude that portion of the award, if any, attributed to that specific injury for which proof is lacking.

Velsicol specifically avers that the plaintiffs failed to prove to a reasonable medical certainty that Wilbanks' kidney cancer, all of the plaintiffs' loss of kidney and liver functions and central nervous system injuries, and Wilbanks' and Ivy's optic atrophy and neuritis were caused by ingesting contaminated water. With respect to Wilbanks' kidney cancer, plaintiffs' testifying physician, Dr. Rhamy, stated that "based upon a reasonable medical certainty ... its more likely [that Wilbanks' kidney cancer] was caused by the chemicals...." While Dr. Rhamy conceded that "[n]o one knows what causes cancer of the kidney," his testimony that Wilbanks' environmental exposure to carbon tetrachloride was the reasonable and probable cause for his kidney cancer constitutes sufficient medical proof. The plaintiffs' testifying physicians, Drs. Balistreri, Clark, Rhamy, and Rodricks, further testified to a reasonable medical certainty that each of the plaintiff's loss of kidney and liver functions and

central nervous system disorders were caused by their exposure to the contaminated water.

■ However, the plaintiffs failed to prove to a reasonable medical certainty that either Wilbanks' or Ivy's optic atrophy and neuritis were caused by ingesting or otherwise using the contaminated water. While plaintiffs' own expert neurooptham-ologist, Dr. Drewery, stated that Ivy's eye problems and his exposure to carbon tetrachloride were causally related and that his reduction in visual acuity and visual field were compatible with toxic exposure, Dr. Drewery, based upon his own tests, concluded that Ivy did not have optic atrophy. Indeed, no physician diagnosed Ivy as suffering from optic atrophy. Dr. Drewery's statement that he was unable to "uncover any ... other medically probable explanation for Mr. Ivy's visual problems than chemical exposure," when considered in view of his negative diagnosis, and Dr. Rhamy's observation that Ivy had a paleness of the optic disc (which Dr. Drewery did not observe) does not constitute sufficient medical proof. Similarly, no physician diagnosed or testified to a reasonable medical certainty that Wilbanks' visual difficulties were caused by his exposure to contaminated water. While plaintiffs Johnson's, Maness', and Sterling's presently ascertainable injuries were all sufficiently substantiated by competent medical testimony, the district court's award to plaintiffs Wilbanks and Ivy is remanded for recalculation to exclude that portion of the award attributed to the specific injuries we

have found to be unsupported by sufficient medical proof.

### 2. Increased Risk of Cancer and Other Diseases

Plaintiffs sought to recover damages for the prospect that cancer and other diseases may materialize as a result of their exposure.[21] The district court awarded the five representative plaintiffs damages predicated upon their being at risk for, or susceptible to, future disease.

■ Where the basis for awarding damages is the potential risk of susceptibility to future disease, the predicted future disease must be medically reasonably certain to follow from the existing present injury. While it is unnecessary that the medical evidence conclusively establish with absolute certainty that the future disease or condition will occur, mere conjecture or even possibility does not justify the court awarding damages for a future disability which may never materialize. Tennessee law requires that the plaintiff prove there is a reasonable medical certainty that the anticipated harm will result in order to recover for a future injury. *See Thompson v. Underwood*, 407 F.2d 994 (6th Cir. 1969); *Maryland Casualty Co. v. Young*, 211 Tenn. 1, 362 S.W.2d 241 (1962); *see also Shelton v. College Station*, 765 F.2d 456 (5th Cir.1985). Therefore, the mere increased risk of a future disease or condition resulting from an initial injury is not compensable. While neither the Tennessee courts,[22] nor this court, has specifically addressed damage awards for increased risk

21. In awarding damages to the plaintiffs for their increased risk to cancer and other diseases, the court stated in pertinent part:

[I]t must be emphasized that the increased susceptibility to kidney and liver disease and cancer is a presently existing condition in each plaintiff who suffered exposure to the various toxins. Plaintiffs produced scientific experts who testified, that, to a reasonable degree of scientific certainty, each plaintiff now has a presently existing condition known as "enhanced or increased susceptibility" to disease. Finally, they testified that the condition resulted from consuming the Velsicol chemicals in the water.

....

In sum, it is generally recognized that a plaintiff is entitled to damages for an enhanced risk of injury occasioned by a defendant's wrongdoing. There is simply no element of speculation in awarding those damages between the condition and defendant's wrongdoing.
647 F.Supp. at 321–22.

22. Specifically, with respect to the future risk of cancer, while the Tennessee courts have not ruled on the issue of awarding damages for increased risk of disease, they have warned against allowing the introduction of evidence of such risk on the grounds of prejudicing the trier of fact. *See Daniels v. Combustion Eng'g*, 583 S.W.2d 768 (Tenn.App.1978).

or susceptibility to cancer and kidney and liver diseases, numerous courts have denied recovery where plaintiffs alleged they might suffer from these future diseases or conditions as a result of existing injuries. For example, in *Ayers v. Jackson,* 189 N.J. Super. 561, 461 A.2d 184 (1983), 325 county residents alleged that toxic wastes leaked through the municipal landfill and contaminated their well water. Plaintiffs' experts testified the ground water was contaminated with numerous known carcinogenic chemicals including benzene, acetone, and chloroform. Plaintiffs argued they suffered from a present condition of enhanced risk of kidney and liver disease and cancer from ingesting the contaminated well water. The *Ayers* court held that damages were not recoverable for such prospective consequences where the plaintiffs' proofs did not establish that they would in the future, to a reasonable medical certainty, suffer from such injury. The court observed that all individuals who were exposed to the well water contamination were at an increased risk of developing cancer and liver and kidney damage. However, the court noted that because plaintiffs' experts could not formulate a quantitative measure to a reasonable medical certainty of excess kidney, liver, and cancer risk, it was left to speculation as to possible consequences of the ingestion of the alleged carcinogens on the future health of each plaintiff. Similarly, in *Hagerty v. L & L Marine Services, Inc.,* 788 F.2d 315 (5th Cir.), *reconsideration denied,* 797 F.2d 256 (5th Cir.1986) (en banc), a plaintiff who was accidentally drenched with chemcials containing known carcinogens, sued for damages including compensation for the increased risk that he would develop cancer in the future as a result of his exposure. The court concluded that because he did not allege with medical certainty that he would develop cancer in the future, he did not state a claim. The court reasoned that plaintiff's increased risk of cancer was not presently compensable because he could not show that the toxic exposure would more probably than not lead to cancer. *See also Herber v. Johns–Manville Sales Corp.,* 785 F.2d 79 (3d Cir.1986); *Devlin v. Johns–Manville Sales Corp.,* 202 N.J.Super. 556, 495 A.2d 495 (1985) (plaintiffs' claims for enhanced risk of cancer from asbestos exposure denied where plaintiffs' expert unable to state to a reasonable medical certainty that plaintiffs would get cancer in the future); *Briggs v. New York Central Hudson River Railroad,* 177 N.Y. 59, 69 N.E. 223 (1903) (kidney problems resulting from spinal injury found to be conjectural and speculative and not a basis of award for damages).

In the instant case, the district court found an increased risk for susceptibility to cancer and other diseases of only twenty-five to thirty percent. This does not constitute a reasonable medical certainty, but rather a mere possibility or speculation. Indeed, no expert witnesses ever testified during the course of trial that the five representative plaintiffs had even a probability—i.e., more than a fifty percent chance—of developing cancer and kidney or liver disease as a result of their exposure to defendant's chemicals.

For the foregoing reasons, the district court's award of compensatory damages to each of the five representative plaintiffs is remanded for recalculation to exclude that portion of the damage award attributed to increased susceptibility to cancer and other diseases.

B. Fear of Increased Risk of Cancer and Other Diseases

Velsicol next argues that the district court erroneously awarded the five representative plaintiffs compensatory damages or, in the alternative, excessive damages for fear of increased risk of contracting cancer and other diseases.[23] Mental dis-

23. In awarding damages to the plaintiffs, the court stated in pertinent part:

Velsicol's conduct caused chemical contaminants to come in contact with or invade each particular plaintiff's body, and impacted upon his or her body. Because those contaminants were of such a nature as to cause the reported symptoms and cellular damage, and adverse biological change, (however slight), the Court considers that this ingestion, inhalation or contact caused emotional distress in each plaintiff.

tress, which results from fear that an already existent injury will lead to the future onset of an as yet unrealized disease, constitutes an element of recovery only where such distress is either foreseeable or is a natural consequence of, or reasonably expected to flow from, the present injury. *See Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982); *Ferrara v. Galluchio*, 5 N.Y.2d 16, 152 N.E.2d 249, *reh'g denied*, 5 N.Y.2d 793, 180 N.Y.S.2d 1025, 154 N.E.2d 581 (1958); *Jones v. United Railroads of San Francisco*, 54 Cal.App. 744, 202 P. 919 (1921). However, damages for mental distress generally are not recoverable where the connection between the anxiety and the existing injury is either too remote or tenuous. *See, e.g., Howard v. Mt. Sinai Hospital*, 63 Wis.2d 515, 217 N.W.2d 383 (1974). While there must be a reasonable connection between the injured plaintiff's mental anguish and the prediction of a future disease, the central focus of a court's inquiry in such a case is not on the underlying odds that the future disease will in fact materialize. To this extent, mental anguish resulting from the chance that an existing injury will lead to the materialization of a future disease may be an element of recovery even though the underlying future prospect for susceptibility to a future disease is not, in and of itself, compensable inasmuch as it is not sufficiently likely to occur. In the context of certain types of injuries and exposures to certain chemicals, cancerphobia has been one basis of claims for mental anguish damages.[24]

In Tennessee, damages for fear arising from an increased risk of disease are recov-

erable. *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431 (Tenn.1982). In *Laxton*, the plaintiffs' water supply was contaminated by the carcinogens chlordane and heptachlor when defendant serviceman sprayed the exterior of plaintiffs' house for termites. The Department of Water Quality Control told plaintiffs to cease using the water for any purpose and to obtain a new water source. As a result of ingesting the contaminated water for over a period of eight months, the plaintiffs worried about their health and the health of their children. The court awarded the plaintiffs $6,000 each for their mental suffering resulting from their reasonable apprehension of the harmful effects to their own and their children's health due to consuming or otherwise using the contaminated water. The *Laxton* court noted that the period of "mental anguish" deserving compensation was confined to the time between the discovery of ingestion of toxic substances and the determination that puts to rest the fear of future injury.

■ In the instant case, the plaintiffs' fear clearly constitutes a present injury. Each plaintiff produced evidence that they personally suffered from a reasonable fear of contracting cancer or some other disease in the future as a result of ingesting Velsicol's chemicals. Consistent with the extensive line of authority in both Tennessee and other jurisdictions, we cannot say that the district court erred in awarding the five representative plaintiffs damages for their reasonable fear of increased risk of cancer and other diseases.

647 F.Supp. at 320–21 (citations omitted).

Moreover, plaintiffs are entitled to recover for fear, distress, or emotional injury because that fear or distress reasonably and naturally flowed or resulted from the disclosure of the nature and possible effects of those chemical contaminants. The Court has considered the nature, extent or duration of such fear of distress, since any award must compensate plaintiffs for any distress experienced since the disclosure of the contaminants in the water up to the present time, and even into the future, because the Court finds the medical and scientific evidence provided justifies the conclusion that such fear and apprehension has continued after disclosure and/or will continue into the future.

**24.** Cancerphobia is merely a specific type of mental anguish. *See Hagerty v. L & L Marine Serv.*, 788 F.2d 315 (5th Cir.), *reh'g denied*, 797 F.2d 256 (5th Cir.1986) (en banc); *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394 (5th Cir.), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129 (5th Cir.1985); *Clark v. Taylor*, 710 F.2d 4 (1st Cir.1983); *Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219 (D.Mass.1986); *Wetherill v. University of Chicago*, 565 F.Supp. 1553 (N.D.Ill.1983); *Dempsey v. Hartley*, 94 F.Supp. 918 (E.D.Pa.1951).

In the alternative, Velsicol asserts that the district court awarded excessive damages to the plaintiffs. The amount of the damage award in a personal injury action is for the jury or, in a non-jury case, the trial judge who heard the evidence. Absent a showing of bias, passion, or corruption, excessiveness of a verdict is left to the trial court's discretion. The appellate court will only consider whether the trial court abused that discretion by granting awards so large as to shock the judicial conscience. *See Stengel v. Belcher,* 522 F.2d 438 (6th Cir.1975), *cert. dismissed,* 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976); *Kroger Co. v. Rawlings,* 251 F.2d 943 (6th Cir.1958); *Olson v. Sharpe,* 36 Tenn.App. 557, 259 S.W.2d 867, *cert. denied,* Tenn.S.Ct. (1953); *Yellow Cab Co. v. Pewitt,* 44 Tenn.App. 572, 316 S.W. 2d 17, *cert. denied,* Tenn.S.Ct. (1958). When considering whether an award is so excessive, this court considers other awards in other cases, as well as the nature and extent of the injuries. *Martin v. Southern Railway,* 225 Tenn. 77, 463 S.W. 2d 690 (1971); *France v. Newman,* 35 Tenn.App. 486, 248 S.W.2d 392 (1951), *cert. denied,* Tenn.S.Ct. (1952).

The evidence credited by the court shows that each of the plaintiffs suffered from, and should be compensated for, a reasonable fear of contracting cancer or some other diseases in the future. The only issue is the amount of reasonable compensation. In *Laxton,* the court limited the amounts of recovery to $6,000 for each plaintiff's reasonable fear of future disease from ingesting known carcinogens over an extended period of time. In the instant case, the district court awarded plaintiffs damages ranging from $50,000 to $250,000. We find these awards to be excessive, particularly where plaintiffs failed to prove at trial that they have a significant increased risk of contracting cancer and other diseases. Upon a review of the opinion and the adopted findings of fact, we are unable to find any basis upon which the district court differentiated its damage awards to each plaintiff for his or her fear of increased risk of cancer and other diseases. The *Laxton* court awarded each plaintiff

$6,000 for his or her fear of increased susceptibility to cancer from consuming known carcinogens for a duration of eight months. Using *Laxton* as a guidepost, we, accordingly, vacate the district court's award and award each of the five representative plaintiffs damages based upon the duration of their exposure to the contaminated water. Plaintiff Johnson, who was exposed to the chemicals for a period of approximately two years, is awarded $18,000 versus the district court's award of $250,000; plaintiff Maness, who was exposed for approximately three years (two years during infancy and approximately one year while his mother was exposed to the chemicals during pregnancy), is awarded $27,000 versus the district court's award of $250,000; plaintiff Ivy, who was exposed for approximately four years, is awarded $36,000 versus the district court's award of $50,000; plaintiff Wilbanks, who was exposed for approximately six years, is awarded $54,000 versus the district court's award of $100,000; and plaintiff Sterling, who was exposed for approximately eight years, is awarded $72,000 versus the district court's award of $75,000.

C. Immune System Impairment and Learning Disorders

Velsicol argues that the district court erroneously awarded all of the plaintiffs damages for alleged impairment to their immune systems and to plaintiff Maness for his additional learning disorders due to his immune system impairment. Velsicol specifically alleges that the court improperly admitted and relied upon testimony which purported to show Velsicol's chemicals harmed plaintiffs' immune systems because the principles upon which the experts based their conclusions were not in conformity to a generally accepted explanatory theory.

The admissibility of expert testimony is governed by Fed.R.Evid. 702 which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-

fied as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In accordance with Rule 702, a four-part test must be met to uphold the admission of "expert testimony": (1) a qualified expert (2) testifying on a proper subject (3) which is in conformity to a generally accepted explanatory theory (4) the probative value of which outweighs its prejudicial effect. *United States v. Kozminski,* 821 F.2d 1186, 1194 (6th Cir.), *cert. granted on other grounds,* —— U.S. ——, 108 S.Ct. 225, 98 L.Ed.2d 185 (1987); *United States v. Brown,* 557 F.2d 541 (6th Cir.1977); *United States v. Green,* 548 F.2d 1261 (6th Cir.1977). With respect to the third criterion, the principles upon which the scientific evidence is based must be sufficiently established to have gained wide acceptance in the field to which it belongs. As we reasoned in *United States v. Brown:*

> There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact. In addition, it is difficult to rebut such an opinion except by other experts or by cross-examination based on a thorough acquaintance with the underlying principles. In order to prevent deception or mistake and to allow the possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts.

557 F.2d at 556, quoting *United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). A review of the record reveals that plaintiffs failed to meet the third criterion of the test.

Plaintiffs' testifying expert immunologist, Dr. Levin, and testifying pediatrician, Dr. Crook, stated that, on the basis of clinical ecological tests, Velsicol's chemicals damaged plaintiffs' immune systems.[25] Clinical ecology is premised on a belief that exposure to a number of factors including, but not limited to, anxiety, radiation, certain chemicals, and even some common household substances can cause dysregulation of the immune system. Treatment for immune system dysregulation consists of rigid diet and environmental control. The leading professional societies in the specialty of allergy and immunology, the American Academy of Allergy and Immunology (AAAI) and the California Medical Association (CMA), have rejected clinical ecology as an unproven methodology lacking any scientific basis in either fact or theory. According to the AAAI, "[t]he theoretical basis for ecologic illness in the present context has not been established as factual, nor is there satisfactory evidence to support the actual existence of 'immune system dysregulation' or maladaption." *Position Statements: Clinical Ecology,* 78 J. Allergy Clinical Immunology, 269, 270 (Aug. 1986). The CMA concludes that there is "[n]o convincing evidence ... that the diagnostic tests employed are efficacious and reliable or that the treatments used are effective." *Clinical Ecology—A Critical Appraisal,* W.J. of Med., 239, 243 (Feb. 1986). While numerous other professional organizations and societies, such as the American Medical Association, the American Board of Allergy and Immunology, and the American Academy of Otolaryngic Allergy, have not discredited completely the potential usefulness of clinical ecology, few have endorsed either its scientific methodology or the results of any experiments conducted under the guise of clinical ecology. Indeed, plaintiffs' experts neither performed nor could identify any

---

**25.** The plaintiffs argue that only treatment, as separate from diagnosis, of immune system dysregulation remains controversial throughout the scientific community. Therefore, plaintiffs argue "no findings as to the testimony of Dr. Levin or Dr. Crook were required" because they were testifying "solely about diagnosis of disease." However, this court cannot locate any relevant authority that suggests that clinical ecology is solely concerned with the treatment of immune system dysregulation exclusive of its diagnosis.

studies of the effects of carbon tetrachloride or chloroform on the immune system. In reaching their conclusions of immune system dysregulation, plaintiffs' experts neither personally examined or interviewed plaintiffs, nor performed the requisite medical tests. The experts based their opinions upon certain blood tests, which revealed a higher than normal white blood cell count, and the plaintiffs' medical histories supplied by their attorneys. Without the requisite clinical tests and a widely accepted medical basis for reaching its conclusions, plaintiffs' experts' opinions are insufficient to sustain plaintiffs' burden of proof that the contaminated water damaged their immune system.

■ The record reveals that plaintiff Maness was borderline retarded and suffered from a severe learning disorder. The sole evidence allegedly linking Maness' learning problems to his chemical exposure was offered by clinical ecologist, Dr. Crook. Dr. Crook testified that Maness' and his mother's ingestion of toxic chemicals "so compromised his resistance that it set him up for a variety of health problems"—in essence immune system dysregulation. Dr. Crook based his conclusions on two examinations in which he determined Maness' physical condition was normal and Maness' general medical history which was provided by his grandmother. He performed no scientific tests to determine the source of Maness' learning disorder. Despite the testimony of other physicians which attributed Maness' learning disorder to other factors, Dr. Crook dismissed the evidence reasoning that "those physicians are unaware of the role of chemical sensitivity in triggering health problems … I feel I have knowledge of [Maness] that they don't have." Despite his personal speculations, Dr. Crook provided no medical basis justifying his conclusion that Maness' learning disorder was caused by ingesting or otherwise using the contaminated water.

Accordingly, we reverse the district court's award of damages to all of the plaintiffs for immune system impairment and to plaintiff Maness for his learning disorder arising out of impairment to his immune system.

**D. Post–Traumatic Stress Disorder**

Velsicol argues that the district court improperly awarded four of the five representative plaintiffs damages for post-traumatic stress disorder (PTSD). Both this court and the courts of Tennessee are familiar with, and have awarded compensatory damages for, PTSD. *See, e.g., Richardson v. Heckler,* 750 F.2d 506 (6th Cir.1984); *Crump v. B & P Construction Co.,* 703 S.W.2d 140 (Tenn.1986); *State v. Spawr,* 653 S.W.2d 404 (Tenn.1983). On appeal, Velsicol specifically argues that the plaintiffs failed to prove the requisite elements of PTSD.

As medically defined, PTSD concerns the development of characteristic symptoms following a psychologically traumatic event generally outside the range of usual human experience. A PTSD diagnosis, according to the American Psychiatric Association definition as relied upon by plaintiffs' experts, requires the satisfaction of all four of the following criteria:

A. Existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone.

B. Reexperiencing of the trauma as evidenced by at least one of the following:

(1) recurrent and intrusive recollections of the event

(2) recurrent dreams of the event

(3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus

C. Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma, as shown by at least one of the following:

(1) markedly diminished interest in one or more significant activities

(2) feeling of detachment or estrangement from others

(3) constricted affect

D. At least two of the following symptoms that were not present before the trauma:

(1) hyperalertness or exaggerated startle response

(2) sleep disturbance

(3) guilt about surviving when others have not, or about behavior required for survival

(4) memory impairment or trouble concentrating

(5) avoidance of activities that arouse recollection of the traumatic event

(6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 236, 238 (3d ed. 1980). Upon review of the record and relevant case authority, we find plaintiffs failed to meet the requisite criteria for a PTSD diagnosis.

■ Plaintiffs' drinking or otherwise using contaminated water, even over an extended period of time, does not constitute the type of recognizable stressor identified either by professional medical organizations or courts. Examples of stressors upon which courts have based awards for PTSD include rape, assault, military combat, fires, floods, earthquakes, car and airplane crashes, torture, and even internment in concentration camps, each of which are natural or man-made disasters with immediate or extended violent consequences. *See, e.g., Smith v. Smith,* 830 F.2d 11 (2d Cir.1987); *Howard v. Chesapeake & Ohio Railway,* 812 F.2d 282 (6th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 78, 98 L.Ed. 2d 40 (1987); *Bode v. Pan American World Airways,* 786 F.2d 669 (5th Cir. 1986); *Richardson v. Secretary of Health and Human Services,* 8 Soc.Sec.Rep.Ser. 156, 750 F.2d 506 (6th Cir.1984). Whereas consumption of contaminated water may be an unnerving occurrence, it does not rise to the level of the type of psychologically traumatic event that is a universal stressor. A plaintiff's claim that a particular event or series of events caused him PTSD must be subjected to the closest scrutiny. The court must demand that a plaintiff produce sufficient authority that the particular event constitutes a "recognized stressor" or a psychologically traumatic event which would produce significant symptoms of distress in almost everyone experiencing such an event. In the *instant case,* the plaintiffs produced none, and this court can identify no relevant authority that the consumption of contaminated water is a recognized stressor upon which an award of PTSD can rest. Additionally, plaintiffs' experts presented no evidence establishing that any of the plaintiffs were, in fact, "retraumatized" through recurrent and intrusive recollections or dreams of drinking the contaminated water. Plaintiff Johnson's nightmares about "what was happening to [his] children and [constant preoccupation] with what their condition was and ... might be in the future" merely describe his reasonable fear of increased risk of cancer and other diseases. Since each plaintiff failed to satisfy all of the criteria necessary for a diagnosis of PTSD, we reverse the district court's award of damages.

### E. Impaired Quality of Life

■ Velsicol argues that the district court erred in awarding three non-resident representative plaintiffs damages for impaired quality of life based upon a nuisance theory. Velsicol specifically alleges that plaintiffs Ivy and Maness, who were never residents of the affected area, and plaintiff Wilbanks, who relocated before state authorities counselled residents to locate an alternative water source, were not entitled to this category of damages as they had no standing to bring a nuisance action. In awarding plaintiffs damages for impaired quality of life, the district court stated in pertinent part:

[I]t is well settled and a traditional principle of law, that damages for anxiety, discomfort and other distress are recoverable in a nuisance action. In other words, such claims are an incidental element of damages to the property damages recoverable when a nuisance is created.

. . . .

One of the prime reasons a nuisance is actionable is that it adversely affects the occupants' right to enjoy the property.

In the case of a residence, the life of the occupants is disrupted. *In a sense, then, although a nuisance is a property action, its gravamen is the disruption of the lives and well being of the residents.* The residents may recover damages for the disruption in the quality of their lives caused by the wrongdoing of defendants. It is well-settled that disruption and inconvenience, in addition to the mental injury are compensible [sic] items in a nuisance action. Simply put, plaintiffs may testify to, and recover damages for, the disruption in their everyday lives and the inconvenience caused by their lack of a potable water supply.

647 F.Supp. at 321 (emphasis added) (citations omitted).

While Tennessee recognizes impairment of enjoyment of life as an element of intangible damages, *Martin v. Southern Railway*, 225 Tenn. 77, 463 S.W.2d 690 (1971); *Dixie Feed & Seed Co. v. Byrd*, 52 Tenn. App. 619, 376 S.W.2d 745 (1963), *cert. denied*, Tenn.S.Ct., *cert. denied*, 379 U.S. 15, 85 S.Ct. 147, 13 L.Ed.2d 84 (1964), the court may not award this category of damages to non-residents on the theory of a nuisance action. Courts that have awarded damages on this basis have properly limited their award to residents of the area affected by the nuisance. *See Kornoff v. Kingsbury Cotton Oil Co.*, 45 Cal.2d 265, 288 P.2d 507 (1955); *Nailor v. C.W. Blakeslee & Sons, Inc.*, 117 Conn. 241, 167 A. 548 (1933); *Dixon v. New York Trap Rock Corp.*, 293 N.Y. 509, 58 N.E.2d 517 (1944), *reh'g denied*, 294 N.Y. 654, 60 N.E.2d 385 (1945); *Riblet v. Spokane–Portland Cement Co.*, 45 Wash.2d 346, 274 P.2d 574 (1954). The district court erred in awarding damages to non-resident plaintiffs on the basis of a nuisance theory. Accordingly, we reverse the district court's award of damages for impairment of quality of life to plaintiffs Ivy, Maness, and Wilbanks.

F. Lost Wages and Earning Capacity

■ Velsicol argues that the district court erroneously awarded damages to plaintiffs Johnson and Maness for lost wages and earning capacity as such award was impermissibly based upon speculation.

Without any discussion whatsoever of either the basis for or the calculations involved, the district court awarded plaintiffs Johnson and Maness $250,000 and $500,000 respectively for lost wages and earning capacity. With respect to Johnson, the extent of plaintiff's proof consisted of his income tax forms from 1972–1975 and the Missouri Division of Family Services' certification that, as of 1980, Johnson was no longer able to continue gainful employment. Plaintiff failed to produce income tax forms or any figures of his annual income for the years during which he lived in Hardeman County, Tennessee, and the years for which he claimed disability. With respect to Maness, plaintiff produced no evidence as to the lifetime earning capacity of a "normal" person of Maness' age and socioeconomic condition. Moreover, Maness failed to prove that his learning disability, which constitutes the single most important factor contributing to his loss of earning capacity, was proximately caused by his ingestion or other usage of the contaminated water or his mother's ingestion of the contaminated water during the term of her pregnancy. Indeed, for neither Johnson nor Maness did the plaintiffs set forth any basis for the amount of damages sought for lost wages and earning capacity.

While Tennessee compensates victims for the loss of the capacity to earn, *Thompson v. National Railroad Passenger Corp.*, 621 F.2d 814 (6th Cir.), *cert. denied*, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980); *Southern Coach Lines, Inc. v. Wilson*, 31 Tenn.App. 240, 214 S.W.2d 55, *cert. denied*, Tenn.S.Ct. (1948), a plaintiff must produce the best evidence available to offer a reasonable basis for estimating the extent of his loss. *Western Sizzling, Inc. v. H.A. Harris*, No. 85, 741 S.W.2d 334 (Tenn. App.1987). We set forth the formula for determining the amount of an award for loss of earning capacity in *Imperial Oil, Ltd. v. Drlik*, 234 F.2d 4 (6th Cir.), *cert. denied*, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed. 2d 236 (1956):

One who is injured in his person by the wrongful act of another may recover loss

of time resulting therefrom and consequent loss of earnings, including future earnings, provided they are shown with reasonable certainty and are not merely speculative in character. The measure of damages in this field is fairly definite, and *the amount awarded is controlled by what the evidence shows concerning the earning capacity of the injured person before and after the accident.*

*Id.* at 11 (emphasis added).

While an award of damages can never be based upon conjecture and speculation, *Redbud Cooperative Corp. v. Clayton,* 700 S.W.2d 551 (Tenn.App.1985); *Maple Manor Hotel, Inc. v. Metropolitan Government of Nashville and Davidson County,* 543 S.W.2d 593 (Tenn.App.1975), where it is shown the plaintiff suffered an injury because of defendant's conduct, mere uncertainty as to the amount of damages sought will not prevent recovery if the evidence is of such certainty as to enable the trier of fact to make a fair and reasonable assessment of damages. *Wilson v. Farmers Chemical Association,* 60 Tenn.App. 102, 444 S.W.2d 185 (1969). To this extent, there exists a clear distinction between the measure of proof necessary to establish that the plaintiff suffered some injury and the measure of proof necessary to enable the trier of fact to assign an amount of damages due as a result of the injury. *Stevens v. Moore,* 24 Tenn.App. 61, 139 S.W.2d 710 (1940). However, the amount of damages must be susceptible of ascertainment by some method other than by mere conjecture or surmise and by reference to some fairly definite standards. In assessing a plaintiff's lost wages and earning capacity, the court should consider, among other characteristics, the plaintiff's record of employment, avenues of occupation open to him, and his physical capacity to perform his job at the time he was injured and thereafter. *Clinchfield Railroad v. Forbes,* 57 Tenn.App. 174, 417 S.W. 2d 210 (1966), *cert. denied,* Tenn.S.Ct. (1967). In the instant case, plaintiffs produced no evidence whatsoever from which the court could have made a reasonable determination of the amount of lost wages for plaintiff Johnson, and the impairment of projected future earnings for both plaintiffs. Accordingly, as the plaintiffs failed in their burden of proof to present sufficient evidence to substantiate the amount of damages sought, we reverse the district court's award of loss of wages and impaired earning capacity to plaintiffs Johnson and Maness.

## G. Diminution of Property Value

■ Velsicol asserts that the district court erred in finding that the current value of one of the representative plaintiff's property was limited to its value as that of timberland. Velsicol asserts that, given the fact that the plaintiff continues living on the property and that the county tax assessor devalued the property by only twenty-eight percent, meant the property had a higher value. Velsicol further asserts that the district court's formula for calculating the diminution of property value for all property owners in the putative class was arbitrary and impermissibly speculative. We disagree with the defendant's contentions.

The district court found that the value of all property within one mile of Velsicol's landfill, the "contaminated zone," had been rendered valueless except for $275 per acre for timber bearing potential; the value of all property outside of the "contaminated zone" but within two miles of the landfill, the "affected zone," had been reduced fifty percent over its timberland value; and the value of all property outside the "affected zone" but within three miles of the landfill, the "tertiary zone," had been reduced ten percent over its timberland value. Sterling, who owned both a home and a rental property in the "contaminated zone," was the only plaintiff owning an identifiable interest in real estate within a three-mile radius of Velsicol's landfill. Based upon the difference in the market value of Sterling's 15.3 acres of residential and rental property before and after Velsicol's chemicals contaminated the area surrounding his properties, the district court awarded him $48,492.50.

Under Tennessee law, the measure of damages for injury to realty is the differ-

ence in market value before and after the commission of the tort allegedly reducing the value of the realty. *See Walton–McDowell Co. v. Jackson*, 5 Tenn.Civ.App. 324 (1914); *see also* 9 Tenn.Juris. Damages § 16 n. 3. The plaintiffs' expert witnesses, James Murdaugh (a real estate appraiser), Joseph Jones (a local bank president), and William Kail (a regional mortgage company vice-president), testified that the market value of a given piece of property is based upon a fully informed arm's-length buyer and seller and available financing to purchase the property. Murdaugh testified that the value of Sterling's property, and all property within the "contaminated zone," was rendered valueless, except for its potential timberland value, and that properties in the "affected zone" and "tertiary zone" declined in value. Jones and Kail testified that their respective institutions would be unwilling to provide any financing for properties within one mile of the landfill site, and only limited financing to properties within three miles of the landfill, since they may be unable to recoup their investment in case of foreclosure. The fact that Sterling retained his properties is irrelevant since he would be unable to sell his property and few, if any, potential buyers even could consider purchasing the property as they would have great difficulty in locating the requisite financing. Additionally, when Sterling contested the county tax appraiser's assessment of his property, the Tennessee State Board of Equalization reversed the appraiser's assessment and assessed Sterling's property as valueless. We find that the district court properly valuated Sterling's property and, moreover, properly differentiated the value of property within the separate "zones" in recognition of the diminution of the value of property within a certain proximity to Velsicol's landfill.

## VI.

### PREJUDGMENT INTEREST

Velsicol asserts that the district court erred not only in awarding prejudgment interest on its award of compensatory damages to the plaintiffs for their personal injuries and property damage claims, but also in using July, 1965, as the date from which prejudgment interest, if any, should accrue. In a diversity case, a federal court is bound by state law on the question of prejudgment interest. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Glens Falls Insurance Co. v. Danville Motors, Inc.*, 333 F.2d 187 (6th Cir. 1964). Tennessee Code Annotated § 47–14–123 provides in pertinent part:

> Pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, *as permitted by the statutory and common laws as of April 1, 1979* may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of the maximum effective rate of ten percent (10%) per annum. . . .

(Emphasis added). While statutory law does not provide for it, in accordance with common law the trier of fact may, in his discretion, award prejudgment interest on a claim for loss or injury to property even where the claim is not certain and is unliquidated. *See, e.g., Irving Pulp & Paper, Ltd. v. Dunbar Transfer & Storage Co.*, 732 F.2d 511 (6th Cir.1984); *Farmers Chemical Association v. Maryland Casualty Co.*, 421 F.2d 319 (6th Cir.1970); *Johnson v. Tennessee Farmers Mutual Insurance Co.*, 556 S.W.2d 750 (Tenn.1977); *B.F. Myers & Sons, Inc. v. Evans*, 612 S.W.2d 912 (Tenn.App.1980). While the district court did not abuse its discretion in awarding Sterling prejudgment interest on his property damage claim, it erred in using July, 1965, as the date from which to calculate the accrual of interest.

Prejudgment interest on a property damage award accrues from the date that the defendant's tortious conduct effectively operates to destroy or diminish either the resale value, the rental value, or even the personal use and enjoyment of the plaintiff's property. *See, e.g., Louisville & Nashville Railroad v. W.A. Fort*, 112 Tenn. 432, 80 S.W. 429 (1903); *City of Columbia v. Lentz*, 39 Tenn.App. 350, 282 S.W.2d 787 (1955). Determining the date

from which prejudgment interest should accrue is not a question of when, in hindsight, a defendant's tortious conduct commenced but, rather, when its conduct actually operated to depreciate the plaintiff's property value. Prejudgment interest serves to compensate the plaintiff for the loss of potential resale income, rents, or personal enjoyment of property suffered as a result of the defendant's tortious conduct prior to judgment. To award prejudgment interest when the plaintiff has suffered no such loss would constitute an impermissible recovery. The district court posed four potential dates prior to selecting July, 1965, as the appropriate date from which prejudgment interest should accrue upon Sterling's property damage claim: (1) October, 1964—the date Velsicol commenced depositing chemical waste into the landfill; (2) July, 1965—the date the Department of Health, Education and Welfare informed the Tennessee Stream Pollution Control Board that, while it had no intentions of conducting an independent ground water study, various federal and state agencies had identified that low concentrations of the chemicals Endrin (0.23 ppb) and Dieldrin (0.12 ppb) had seeped from Velsicol's landfill into Sterling's well; (3) 1969—the date the plaintiffs' water computing model predicted that high concentrations of the chlorinated hydrocarbons, carbon tetrachloride, and chloroform had seeped into and contaminated Sterling's well; and (4) 1974—the date Velsicol's water computing model predicted that high concentrations of these chlorinated hydrocarbons had seeped into and contaminated Sterling's well. While there is evidence that low concentrations of Velsicol's chemicals seeped into Sterling's well in July, 1965, and that even higher concentrations of Velsicol's chemicals seeped into Sterling's well as early as 1969, there is no evidence that this chemi-

cal contamination resulted in a depreciation in either the market resale or rental value of Sterling's property prior to 1978. The only evidence of when the chemical contamination of Sterling's well actually affected the marketability of his property was proffered by the plaintiffs' expert witness, James Murdaugh (a real estate appraiser), who testified:

It's my opinion in the market research that I did at the courthouse that the effect of the property damage occurred somewhere around 1978, the latter part of '78 to '79. Primarily it became—the public became aware of it when it became public knowledge, when the report was filed and it was made available for people to the general public.

Accordingly, the district court's award of prejudgment interest on Sterling's property damage claim is remanded to determine the date, not earlier than January 1, 1978, when the public sufficiently became aware of the chemical contamination of Sterling's well so as to effectively depreciate the market resale or rental value of his property. To the extent that other class members present property damage claims, the district court further is instructed to ascertain when the chemical contamination of that particular class member's property served to depreciate its market resale or rental value in setting an accrual date for an award, if any, of prejudgment interest.

■ With regard to the district court's award of prejudgment interest for the representative plaintiffs' personal injuries, no statutory or common law in Tennessee provides for prejudgment interest on compensatory awards for physical or emotional damages.[26] It is a longstanding principle of Tennessee common law that prejudgment interest cannot be awarded on personal injury claims. In *Louisville & Nashville Railroad v. Wallace*, 91 Tenn. 35, 17 S.W.

---

26. *See, e.g.,* 16 Tenn.Juris.Interest § 5 ("Interest is allowed for wrongs to property, but it is not allowed in such actions as ... for personal injury by negligence ..."); Hare and Meelheim, *Prejudgment Interest in Personal Injury Litigation: A Policy of Fairness,* 5 Am.J.Trial Advoc. 81, 92 (Summer 1981) (Tennessee not listed among states with statutes "allowing some type of prejudgment interest in tort claims."); Note,

*Recovery of Prejudgment Interest on an Unliquidated State Claim Arising Within the Sixth Circuit,* 46 U.Cin.L.Rev. 151 (1977) (personal injury claims in Tennessee do not bear prejudgment interest); Note, *Prejudgment Interest: Implementing Its Compensatory Purpose,* 15 Loy.U. Chi.L.J. 541, 547 n. 36 (1984) (Tennessee not listed among 15 states allowing prejudgment interest awards in tort cases).

6

1215

882 (1891), the Supreme Court of Tennessee refused to affirm a prejudgment interest award, finding that personal injury damages are defined as and are limited to "pain, suffering, and disability to date of judgment and prospectively beyond, it is intended to be and is the full measure of recovery and cannot be supplemented by the new element of damages for detention of this sum from the date of the injury." *Id.* at 37, 17 S.W. at 883. The Tennessee Supreme Court held that personal injury cases are not governed by the same rule as that involving the destruction, conversion, or misappropriation of property where prejudgment interest may be awarded in the court's discretion:

> [S]uch rule applies alone to such cases, and *not to that of personal injury,* which does not cease when inflicted, and is not susceptible of definite and accurate computation. It never creates a debt, nor becomes one until it is judicially ascertained and determined. Only from that time can it draw interest, *and interest as damages cannot at any preceding time be added to it without changing and superadding a new element— never given in this State....*

*Id.* at 38, 17 S.W. at 883 (emphasis added).

The *Wallace* decision has not been overruled nor has its result been changed by statute. Plaintiffs' policy argument that the *Wallace* rule, which denies the recovery of prejudgment interest on personal injury awards, should no longer stand is more appropriately made before the Tennessee courts or the state legislature. Accordingly, we reverse the district court's award of prejudgment interest on any of the compensatory damage awards for personal injuries as there is no common law or statutory authority to make such an award.

**27.** Velsicol also argues the district court improperly rejected its argument that punitive damages should not be awarded against an innocent successor corporation. On May 30, 1985, Farley Industries, through its subsidiary Farley Northwest Acquisition Corporation, acquired control over Northwest Industries which wholly owned Velsicol Chemical Corporation. This court has cautioned that the award of punitive damages is inappropriate where the successor corporation was a new and different entity and where the successor corporation and its owners are wholly

## VII.

## PUNITIVE DAMAGES

Lastly, Velsicol argues that the district court erred in awarding the entire class punitive damages on the grounds of Velsicol's conduct during the course of litigation, upon the baseless conclusion it willfully and wantonly violated state law in disposing its chemicals, and before determining compensatory damages to the entire class.[27]

In awarding punitive damages, the district court stated in pertinent part:

> The Court has concluded that a single award of punitive damages is appropriate and should be awarded in this case. The Court finds this decision appropriate, because it has heard all of the evidence on all of the significant issues that can be presented for decision in this class action. The Court finds Velsicol's actions in locating, creating, maintaining and operating its chemical waste burial site constituted gross negligence and a wilful and wanton disregard for the health and well being of plaintiffs and the adjacent environment. This is particularly true when the Court considers Velsicol's superior knowledge about chemicals used in its manufacturing process.

647 F.Supp. at 307. The district court noted there were at least three possible justifications for such an award and then based the award upon a portion of the profits Velsicol earned as a result of utilizing the landfill rather than incinerating the chemicals.

In assessing its award of punitive damages, the district court stated:

> innocent of the allegedly unlawful activities. *Drayton v. Jiffee Chem. Corp.,* 591 F.2d 352 (6th Cir.1978). However, in *Drayton,* the trial court noted both improving industry practices, and a change in corporate ownership, as weighing against such an award. Velsicol provides no evidence of such beneficial changes in either its practices or management to merit the alleviation of such an award. *See Moran v. Johns-Manville Sales Corp.,* 691 F.2d 811 (6th Cir. 1982).

**1216**

[V]elsicol's actions in creating, maintaining and operating its chemical waste burial site, with superior knowledge of the highly toxic and harmful nature of the chemical contaminants it disposed of therein, and specifically its failure to immediately cease dumping said toxic chemicals after being warned by several state and federal agencies ... constituted gross, wilful and wanton disregard for the health and well-being of the plaintiffs, and therefore is supportive of an award of punitive and exemplary damages.

The Court further concludes that Velsicol's attempt to allege that plaintiffs were guilty of assuming the risk, or were guilty of contributory negligence is without factual basis and so outrageous as to subject the defendant to punitive damages.

In addition the Court further finds that Velsicol has also attempted to shift the liability and causation for the psychological disorders suffered by the plaintiffs to the local, state and federal authorities, claiming that the defendant cooperated with them in their attempts to monitor the situation and persuade Velsicol to limit its activities. They contend that news coverage of this case specifically caused the post-traumatic stress disorder. The Court concludes that these attempts by Velsicol are also so outrageous that punitive damages should be imposed.

647 F.Supp. at 323–24.

Punitive damages are allowed under Tennessee law and are given in excess of, and in addition to, compensatory damages. They are awarded in cases involving fraud, malice, gross negligence, or oppression, *Knoxville Traction Co. v. Lane*, 103 Tenn. 376, 53 S.W. 557 (1899), or where a wrongful act is done with a bad motive or recklessly as to imply a disregard of social obligation, *Stepp v. Black*, 14 Tenn.App. 153 (1931), or where there is such willful misconduct as to raise a presumption of conscious indifference. *Honaker v. Leonard*, 325 F.Supp. 212 (E.D.Tenn.1971); *Inland Container Corp. v. March*, 529 S.W.2d 43 (Tenn.1975). In the state of Tennes-

see, punitive damages are not recoverable as a matter of right, but are within the sound discretion of the trial judge. We will not reverse an award of punitive damages without proof of an abuse of discretion. Moreover, in reviewing a trial court's justification for awarding such damages, we view the record in its entirety rather than each particular factor in isolation. The theory behind awarding punitive damages is not to compensate an injured plaintiff for personal injury but to punish a defendant and deter him from committing acts of similar nature. *Huckeby v. Spangler*, 563 S.W.2d 555 (Tenn.1978); *Booth v. Kirk*, 53 Tenn.App. 139, 381 S.W.2d 312 (1963).

While the court may award punitive damages when a party's conduct during the course of litigation is either frivolous or in bad faith, *Reynolds v. Pegler*, 223 F.2d 429 (2d Cir.1955); *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986), a review of the entire record does not suggest that defendant's conduct warranted such punitive sanctions. Unlike *Universal City Studios*, in which the Second Circuit held punitive damages were appropriate where defendant threatened suit alleging trademark infringement despite a prior judicial holding that its trademark was in the public domain, Velsicol's defenses during the course of litigation did not constitute an abuse of process.

There is no evidence that Velsicol's defense was contrived in bad faith. In deciding whether counsel's positions at trial warrants awarding punitive damages, too strict a standard might unduly chill an attorney's advocacy, especially for those advancing unpopular arguments. This determination requires sensitivity on the part of the court. *See, e.g., Blake v. National Casualty Co.*, 607 F.Supp. 189 (C.D.Cal. 1984). Velsicol's conduct in the instant case is an impermissible basis in and of itself for awarding punitive damages.

There is, however, evidence supporting the district court's determination that Velsicol violated state law in establishing, utilizing, and refusing to cease dispos-

al operations at the landfill disposal site. It was within the district court's discretion to consider defendant's disregard of state law in making its award. Lastly, the district court need not defer its award of punitive damages prior to determining compensatory damages for the entire class of 128 individuals. So long as the court determines the defendant's liability and awards representative class members compensatory damages, the district court may in its discretion award punitive damages to the class as a whole at that time. Because the district court erred in awarding punitive damages, in part, upon the positions taken by Velsicol at trial, we remand for recomputation of punitive damages.

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for recalculation of damages.

NATHANIEL R. JONES, Circuit Judge, concurring.

While concurring in the judgment and much of the reasoning of the majority, I must write separately to set out my view of the appropriate degree of proof on damages. The majority concludes that certain of plaintiffs' alleged injuries were *not* proven to a reasonable medical certainty. Accordingly, the majority would remand for recalculation of the damage awards to exclude those portions of the awards attributed by the district court to injuries the majority finds unsupported by sufficient medical testimony.

My difficulty with the majority's treatment of the damages issue is the overly rigid way in which it applies the conceded legal standard of proof of a reasonable medical certainty. The majority correctly states that before there can be recovery, causation must be shown to a reasonable medical certainty. This court pointed that out in *Thompson v. Underwood*, 407 F.2d 994 (6th Cir.1969). However in *Thompson* we noted that this was a "general rule" and, further, that the substance of a doctor's testimony should not be disregarded "merely because he fails to use the magic words 'reasonable medical certainty.'" *Id.* at 997.

There were several descriptive terms used by the medical experts in this case, though I acknowledge the absence of the magic words "reasonable medical certainty." However, if, as this court held in *Thompson*, the requirement is general and magic words are not necessary, the district court, as the fact finder, is free to reach Rome by an alternate route, so long as there is proof of exposure to the chemicals and of various injuries. The sufficiency of that proof, I would leave to the trier of fact, be it a judge or a properly instructed jury. It seems to me that the general standard of proof can be met, on a prima facie basis, where the record contains expert testimony on the chemicals and its properties, and proof of exposure to the chemicals supported by some medical testimony. It seems to me that at this point a rebuttable presumption of proximate causation ought to arise. The failure of the defendant to rebut this presumption would then give rise to a conclusion of reasonable medical certainty.

On remand, I would not foreclose the district court from engaging in burden shifting as discussed above, if it finds that the record as a whole demonstrates a rebuttable presumption of proximate causation for the injuries allegedly attributable to defendant's chemicals. In the event the defendant fails to rebut the presumption, the fact finder may find that the presumption becomes conclusive.